IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INGRID ODETTE GARCIA,

               Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social
Security,

            Defendant.

Case No.  14 C 4865

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Ingrid Odette Garcia ("Garcia") seeks reversal or remand of the final decision of Carolyn W. Colvin, Acting Commissioner of the Social Security Administration (the "Commissioner"), denying her application for disability insurance benefits ("DIB").  This matter is before the Court on Cross-Motions for Summary Judgment.  For the reasons stated below, the Commissioner's motion [ECF No. 18] is denied, and Garcia's Motion [ECF No. 9] is granted.  The Court remands the case to the Social Security Administration (the "SSA") for further proceedings consistent with this opinion.

## I.  BACKGROUND

All citations to numbered exhibits or "R." refer to the administrative record [ECF No. 4-1].  On June 20, 2011, Garcia filed an application for DIB, alleging that she became disabled on

December 9, 2010. (Ex. 1D.) Garcia does not dispute that her date last insured ("DLI") under the Social Security Act (the "Act") was December 31, 2010. (R. 27.)

Garcia's application was denied initially, (Ex. 4B), and that decision was affirmed upon reconsideration, (Ex. 5B). Garcia then sought a hearing before an Administrative Law Judge ("ALJ"), which was held on December 14, 2012. (R. 25.) The ALJ assigned to the case, Jose Anglada, found that Garcia was not disabled. (R. 37.) On March 6, 2014, the Appeals Council denied Garcia's subsequent request for review. (R. 11.)

## A. The ALJ Hearing

At the ALJ hearing, Garcia appeared with assistance of a non-attorney representative. Garcia and two other witnesses – her husband, Geraldo Madrigal ("Madrigal"), and a vocational expert ("VE"), Edward Pagella — gave testimony.

Garcia testified first. Until December 8, 2010 — the day before her right knee was crushed between two cars — Garcia worked at Tecnica Environmental Services ("Tecnica"), where she performed administrative and bookkeeping work. (R. 48.) On December 9, 2010, Garcia was picking her daughter up from school. (R. 51.) As she walked in front of her vehicle, another car hit her vehicle from behind, pinning Garcia between her own vehicle and another immediately in front of it. (R. 53–54.) The collision fractured Garcia's right knee, and she was rushed to an emergency room.

(R. 51.) Four surgeries followed, (R. 52-53), then approximately a year of physical therapy, (R. 55). Garcia walked with a walker, and then crutches, which she used until June 2012. (R. 56.) Garcia continues to use a knee brace and cane. (R. 58-59, 68.)

Garcia testified that she suffers from arthritis in her right knee and regularly sees an orthopedic surgeon, who monitors her condition and gives her cortisone shots. (R. 59-60.) Garcia also testified that she suffers from post-traumatic stress disorder ("PTSD"), anxiety, and depression, for which she takes medication. (R. 63-64.) Garcia stated that she experiences "excruciating pain." (R. 69.) She is only able to walk a half a block with a cane, stand for ten to fifteen minutes at a time, and sit for about thirty minutes at a time. (R. 67, 69.) Garcia no longer cooks, drives, or shops for groceries. (R. 67, 69.) Per her doctor's instructions, she rides a stationary bike for approximately five to ten minutes a day. (R. 68.)

The VE testified that Garcia's position at Tecnica was skilled and sedentary. (R. 67.) The ALJ then posed a hypothetical question. (R. 77.) He asked the VE whether an individual with Garcia's education and experience, who could "lift and carry 20 pounds occasionally and ten pounds frequently and can be on her feet standing and walking about six hours in an eight-hour workday with normal rest periods," but who would need to alternate between sitting and standing, and who could not climb ladders or negotiate

stairs and was subject to other limitations, would be able to perform Garcia's past work. (*Id.*) The VE testified that such an individual would be able to do so. (*Id.*) The VE indicated that, to sustain competitive employment, an individual in that position would have to be on task at least 85% of the time and not miss more than one and three-quarters of a day of work per month. (R. 78.)

Garcia's husband then testified. Madrigal stated that "after the accident, everything changed." (R. 82.) He described his wife's transformation from a happy and healthy person to someone who's "just like a zombie." (*Id.*) Madrigal, who works in the afternoon, has taken over all household duties and childcare. (*Id.*) Garcia no longer performs even basic tasks — such as supervising the children's homework or filling their cereal bowls. (R. 86–88.) According to Madrigal, Garcia has a hard time walking or sitting, is "never comfortable in any position," and complains constantly of pain. (R. 82–83.)

### B. Medical Evidence

Records of Garcia's medical treatment begin the day of the accident, when she was rushed to Advocate Christ Medical Center for emergency surgery. (Ex. 1F at 281.) Garcia had suffered blunt trauma to the right knee with arterial bleeding, and crush injury to the right knee with fracture of the femur. (*Id.*) Approximately one week later, on December 16, 2010, Garcia underwent a lateral

fasciotomy closure with skin flaps. (*Id.* at 288.) On December 23, 2010, Garcia underwent a third surgery to treat right knee dislocation. (*Id.* at 290.)

After her first three surgeries, Garcia began follow-up treatment and physical therapy with George Branovacki, M.D. (Ex. 7F.) Dr. Branovacki performed a fourth surgery on March 17, 2011, which included a right knee arthrotomy, open lysis of adhesions, removal of hardware, and bone grafting to the femur fracture holes. (Ex. 1F at 269.) A post-operative report indicated that Garcia was making slow progress and that she would benefit greatly from ongoing physical therapy. (Ex. 7F at 378.) The report indicated that the patient's goal was "to walk again." (*Id.*) Subsequent progress reports from Dr. Branovacki in April and May 2011 indicated improving calf strength and range of motion in the knee. (*Id.* at 338–39.) By June 20 2011, Dr. Branovacki reported "incredible range of motion" and "full extension." (*Id.* at 337.) Nevertheless, that same day, he filled out a major dysfunction of a weight-bearing joint report indicating that Garcia met the severity criteria set forth in section 1.02 of the Listings set forth at 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In June 2011, Garcia also began seeing Sudhir Gokhale, M.D. for depression and anxiety and started to take medication to treat these conditions. (Ex. 8F.) In July 2011, Gene Carroccia ("Carroccia"), Psy.D., prepared a mental RFC questionnaire

indicating that Garcia's mental abilities and aptitudes needed to perform unskilled work ranged from "limited to satisfactory" to "unable to meet competitive standards." (Ex. 3F at 299.) In the category of performing work without unreasonable rest periods, Carroccia indicated that Garcia had "no useful ability to function." (*Id.*)

In September and October 2011, two state agency medical consultants evaluated Garcia's case. M.W. DiFonso, Psy.D., completed a Psychiatric Review Technique Form ("PRTF"), and found insufficient evidence of Garcia's mental impairments from her alleged onset date ("AOD") of December 9, 2011 to her December 31, 2011 DLI. (Ex. 5F.) Lenore Gonzalez, M.D., prepared an Illinois Request for Medical Analysis, and denied Garcia's claim due to insufficient evidence. (Ex. 6F.) Dr. Gonzalez's findings were subsequently affirmed by Michael Schneider, Ph.D. (Ex. 9F.) On February 21, 2012, state agency medical consultant David Bitzer, M.D., performed a physical RFC assessment. (Ex. 10F.) Dr. Bitzer found no exertional, manipulative, visual, communicative, or environmental limitations, and that Garcia could occasionally kneel, crouch, and crawl. (*Id.*)

In November 2011, Dr. Branovacki submitted another progress report, indicating that Garcia was walking, sometimes without a brace, and that she had pain, but was "able to live with it for now." (Ex. 7F at 335.) The report also discussed x-rays showing

"joint space narrowing" and stated that Garcia was developing arthritis in her knee. (*Id.*)

Garcia continued to see Dr. Gokhale and Dr. Carroccia through early 2012, and their treatment notes appear to reflect some improvement. (Exs. 11F & 12F.) For instance, Dr. Gokhale's notes from March 2012 report that medication was helping, and that Garcia was "stable overall" and "doing better." (Ex. 11F at 404.)

### C.  The ALJ's Decision

The ALJ determined that Garcia suffered from the following medically determinable severe impairments:  "status post crush injury to the right knee" and "status post multiple surgeries." (R. 27.)  Although the ALJ found these impairments severe, he concluded that they did not meet the severity criteria for "major dysfunction of a joint," set forth in Listing 1.02. (R. 28.)  The ALJ concluded that Garcia's medically determinable impairments of PTSD and depression were not severe. (R. 27–28.)

After reviewing the record in its entirety, the ALJ determined that, through her DLI, Garcia had the residual functional capacity ("RFC") to perform light work subject to certain limitations. (R. 28.)  She could be on her feet standing or walking six hours in an eight-hour day, but would need to be able to alternate between sitting and standing. (*Id.*)  The ALJ further found that Garcia could not work at heights, climb ladders, or frequently negotiate stairs, and that she could only

occasionally crouch, kneel or crawl. (*Id.*) Garcia could be expected to be off task 5% of the time in an eight-hour day. (R. 29.) In reaching this conclusion, the ALJ gave only limited weight to Dr. Branovacki's major dysfunction of a weight-bearing joint report because Dr. Branovacki's subsequent treatment notes showed that Garcia was making progress, and assigned greater weight to the findings of Dr. Bitzer. (R. 35.) The ALJ accepted the VE's testimony, and found that Garcia was capable of performing her past relevant work. (R. 36.) Ultimately, the ALJ concluded that Garcia was not disabled within the meaning of the Act prior to her DLI. (R. 37.)

## II. <u>LEGAL STANDARDS</u>

### A. Disability Standard

To qualify for DIB, a claimant must establish that she is "disabled" under the Act. The Act specifies that a person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Because DIB are only available to persons who meet the Act's insured status requirements, "a claimant must be disabled before his or her DLI to be eligible for benefits." *Tenorio v. Colvin,*

2014 WL 4627196, at *8 (N.D. Ill. Sept. 15, 2014) (citations omitted).

In determining whether a claimant is disabled, the ALJ is required to apply a five-step sequential evaluation, considering: (1) whether the claimant is employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that meets or equals the severity criteria set forth in the Listings, (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is capable of making an adjustment to other work. 20 C.F.R. § 404.1520(a)(4); *Simila v. Astrue,* 573 F.3d 503, 512–13 (7th Cir. 2009). Steps Four and Five require the ALJ to assess the claimant's RFC, which is "the most [a claimant] can do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

The claimant bears the burden of proof with respect to the first four steps. *Briscoe v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005). If the ALJ determines at any one of these four steps that the claimant is or is not disabled, the ALJ is not required to proceed further. 20 C.F.R. § 404.1520(a)(4). If, however, the claimant sustains her burden of proof for the first four steps, the burden shifts at Step Five to the Commissioner, who must then present evidence establishing that the claimant possesses the RFC to perform work that exists in a significant quantity in the

national economy. *Weatherbee v. Astrue,* 649 F.3d 565, 569 (7th Cir. 2011).

## B. Standard of Review

Section 405(g) of the Act authorizes judicial review of the ALJ's decision. *See,* 42 U.S.C. § 405(g). "The court reviews the Commissioner's legal determinations *de novo* and her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence." *Daniels v. Colvin,* No. 12 C 9317, 2014 WL 2158999, at *7 (N.D. Ill. May 23, 2014) (citing *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010)). Substantial evidence is evidence such that "a reasonable mind might accept as adequate to support a conclusion." *Jones,* 623 F.3d at 1160 (citation and internal quotations omitted).

A reviewing court should consider the record as a whole, but should not substitute its opinion for that of the ALJ or re-weigh the evidence. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). Even if "reasonable minds could differ concerning whether [the claimant] is disabled," the ALJ's determination will be upheld as long as it has "adequate support" in the record. *Simila,* 573 F.3d at 513 (citation and internal quotations omitted). Although the ALJ need not address every piece of evidence presented, he or she must provide a "logical bridge" from the evidence to his or her conclusions. *Jones,* 623 F.3d at 1160. "A decision that lacks adequate discussion of the issues will be

remanded." *Moore v. Colvin,* 743 F.3d 1118, 1121 (7th Cir. 2014). However, under the harmless-error doctrine, the Court will not remand a case where the ALJ is certain to reach the same result. *McKinzey v. Astrue,* 641 F.3d 884, 892 (7th Cir. 2011).

### III.  ANALYSIS

Garcia argues that the ALJ erred in four respects: (1) concluding that her mental impairments only arose after her DLI, and, in any case, were not severe, (2) concluding that her physical impairments did not meet the severity criteria set forth in the Listings, (3) assessing her credibility, and (4) assessing her RFC.  Although Garcia's memorandum is often difficult to follow, in part because of numerous grammatical errors and incomplete citations, it identifies several places where a "logical bridge" between the evidence and ALJ's conclusion is missing, making remand appropriate.

### A.  Mental Impairments

The ALJ concluded that Garcia's medically determinable mental impairments of depression and PTSD were not severe, and observed that "[t]he State Agency found insufficient evidence from the alleged onset date last insured as to the mental impairments." (R. 27.)  Garcia argues that the ALJ ignored the fact that she was in a coma prior to her DLI and thus "not aware of what was happening to her," and misjudged the severity of her mental impairments. (Pl.'s Mem., ECF No. 10, at 13–14.)  The Commissioner

responds that "the ALJ properly found that Garcia had no severe mental impairment because the record showed no evidence of any mental health diagnoses or treatment until subsequent to her [DLI]" and properly concluded that her mental impairments were not severe because they did not meet the criteria in the Listings. (Def.'s Mem, ECF No. 19, at 4-6.)

Where, as here, a claimant presents evidence that he or she suffers from a mental impairment, the ALJ is to apply the "special technique" set forth at 20 C.F.R. § 404.1520a. The Seventh Circuit has described the technique as follows:

> [T]he ALJ must, in determining whether the claimant has a severe impairment (step two of the five-step analysis), rate the degree of the functional limitation resulting from the claimant's impairment with respect to four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ must rate the claimant's limitation in the first three categories as none, mild, moderate, marked, or extreme, and number the claimant's episodes of decompensation. *Id.* § 404.1520a(c)(4). If there are no episodes of decompensation and the rating in each of the first three categories is none or mild, the impairment generally is not considered severe and the claimant thus is not disabled. *Id.* § 404.1520a(d)(1).

*Richards v. Astrue,* 370 F. App'x 727, 730 (7th Cir. 2010). Even when a claimant only receives treatment for mental illness after her DLI, that treatment is nevertheless relevant to assessing [her] condition during the disability period." *Newell v. Astrue,* 869 F.Supp.2d 875, 885-86 (N.D. Ill. 2012); *see also, Halvorsen v. Heckler,* 743 F.2d 1221, 1225 (7th Cir. 1984).

- 12 -

Here, Dr. DiFonso completed a PRTF indicating that there was "insufficient evidence" to evaluate Garcia's mental impairment between her AOD and DLI. (Ex. 5F.) The ALJ noted this finding in his decision, and also observed that Garcia did not complain of or receive treatment for any mental impairments prior to May 2011, approximately five months after her DLI. (R. 27–28.) Ultimately, however, the ALJ appears to have relied on Exhibit 8F — Dr. Gokhale's treatment notes — in determining that that Garcia's limitations in the first three functional areas was "no more than mild" and that she suffered no episodes of decompensation. (R. 28.) The ALJ concludes: "I find that the claimant's mental impairments were not severe (Exhibit 8F), which is consistent with the longitudinal record including the time period from her [AOD] to her [DLI]." (R. 27–28.)

This passing reference to Exhibit 8F is the only mention of Dr. Gokhale's treatment notes in the ALJ's Step Two analysis. Although the decision adequately summarizes the treatment notes at Step Four, (*see, id.* at 32–35), it does not explain how Dr. Gokhale's notes guided the ALJ in concluding that Garcia's limitations were mild in the areas of daily living, social functioning, concentration, persistence, or pace. As the Seventh Circuit has cautioned, recounting a claimant's mental health history in the RFC analysis is not a substitute for the special technique. *Richards,* 370 F. App'x at 730. Without any foundation

for the ALJ's "mild" rating, the Court "cannot discern the necessary logical bridge from the evidence to the ALJ's conclusions." *Id.* at 731. The ALJ is directed to supply this connection on remand.

## B. Physical Impairments

The ALJ concluded that although Garcia's medically determinable physical impairments were severe, they did not meet the severity criteria set forth in Listing 1.02 — "Major dysfunction of a joint[] (due to any cause)." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Garcia argues that the ALJ's determination was erroneous for three reasons. First, the ALJ ignored reports prepared by her treating physician, Dr. Branovacki, and other favorable evidence. Second, the ALJ failed to review Listing 1.03. Third, the ALJ failed to review Listing 4.00.

The Court addresses Garcia's third argument first. A claimant bears the burden of showing that her impairment meets a Listing and satisfies all the criteria the Listing contains. *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006). Listing 4.00 involves cardiovascular impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In support of Listing 4.00, Garcia refers to a CT exam identifying "evolving hematoma and edema of the musculature," (Ex. 1F at 262), and notes that she testified to throbbing pain in her leg at the hearing. As the Commissioner correctly notes, Garcia's lay interpretation of a diagnostic

image, coupled with her own testimony, is insufficient to establish the existence of a cardiovascular impairment. Because Garcia has presented no evidence of a cardiovascular impairment, the ALJ's failure to consider this specific Listing at Step Three is no basis for remand. *See, Knox v. Astrue,* 327 F. App'x 652, 655 (7th Cir. 2009).

The Court now turns to Listing 1.02. Under Listing 1.02, major dysfunction of a joint is characterized by "gross anatomical deformity (*e.g.,* subluxation, contracture, bony or fibrous ankylosis, instability)," "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)," and "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint," as well as the "inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1. In support of Listing 1.02, Garcia cites Dr. Branovacki's June 2011 report, indicating that Garcia had major dysfunction of a weight-bearing joint and was ambulating with crutches and a cane, (Ex. 2F), and notes Dr. Branovacki's interpretation of an x-ray in November 2011 showing "increased joint space narrowing," (Ex. 7F at 363). The ALJ's analysis of Listing 1.02 makes no mention of any of this evidence, and instead provides the following generic assessment:

> There is no evidence of any gross anatomical deformity .
> . . and chronic joint pain and stiffness with signs of

limitation of motion or other abnormal motion of the
affected joint(s) and findings on appropriate medically
acceptable imaging of joint space narrowing, bony
destruction, or ankylosis of the affected joint(s) with
involvement of one major peripheral weight bearing joint
(hip, knee, or ankle) resulting in an inability to
ambulate effectively as defined in 1.00B2b within the
timeframe of her alleged onset date through the date
last insured. 12 months after the accident, the
evidence of record does not support a finding of
disability.

(R. at 28.)

"In considering whether a claimant's condition meets or
equals a listed impairment, an ALJ must . . . offer more than a
perfunctory analysis of the listing." *Barnett v. Barnhart,* 381
F.3d 664, 668 (7th Cir. 2004). Although the Commissioner's brief
cites evidence on which the ALJ may have relied, such as Garcia's
continued improvement through physical therapy, the SSA's lawyers
cannot "defend the agency's decision on grounds that the agency
itself has not embraced." *Parker v. Astrue,* 597 F.3d 920, 922
(7th Cir. 2010); *see also, Mitchell v. Colvin,* No. 11 CV 50015,
2014 WL 4680848, at *5 (N.D. Ill. Sept. 19, 2014) ("[E]ven when
adequate record evidence exists to support the Commissioner's
decision, the decision will not be affirmed if the Commissioner
does not build an accurate and logical bridge from the evidence to
the conclusion."). Because there is no mention of any medical
evidence in the ALJ's assessment of Listing 1.02 — much less, any
reason why such evidence was rejected — this issue is remanded to
the ALJ for redetermination.

Like Listing 1.02, Listing 1.03 – "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint" – requires a claimant to demonstrate the inability to ambulate effectively. Therefore, the ALJ need only consider this Listing on remand if he determines that the evidence shows that Garcia could not ambulate effectively.

## C. Credibility Determination

The ALJ found that Garcia's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her testimony was not credible. (R. 35.) Garcia argues that the ALJ improperly disregarded her testimony concerning her symptoms — namely, pain. The Commissioner responds that the ALJ's credibility determination is entitled to deference and cites various pieces of evidence contained in the ALJ's decision, including that Garcia "improved with physical therapy, had 'incredible' range of motion in her knees, and could walk occasionally without any assistive device." (Def.'s Mem., ECF No. 19, at 10.)

Although an ALJ's credibility determination is entitled to deference "and will not be disturbed unless unreasonable or unsupported," the ALJ "must explain a determination that the claimant lacks credibility." *Oakes v. Astrue,* 258 F. App'x 38, 43 (7th Cir. 2007) (citations omitted). In determining the veracity of a claimant's symptoms, the ALJ considers factors including:

> (1) the claimant's daily activities; (2) the location,
> duration, frequency, and intensity of the claimant's
> pain or other symptoms; (3) factors that precipitate and
> aggravate the symptoms; (4) the type, dosage,
> effectiveness, and side effects of any medication the
> claimant takes or has taken to alleviate pain or other
> symptoms; (5) treatment, other than medication, that the
> claimant receives or has received for relief of pain or
> other symptoms; (6) any measures the claimant uses or
> has used to relieve pain or other symptoms; and (7) any
> other factors concerning the claimant's functional
> limitations and restrictions due to pain or other
> symptoms.

*Fratantion v. Colvin,* No. 13 C 648, 2014 WL 3865249, at *11 (N.D.

Ill. Aug. 5, 2014) (citing 20 C.F.R. § 404.1529(c)(3)). At the

hearing, Garcia testified that excruciating pain makes it

difficult to perform daily tasks, such as cooking or shopping,

that the act of sitting or standing could aggravate her symptoms,

and that the treatment she receives offers little relief. (*See,*

R. 61, 66–69.)

The ALJ's opinion states that "[Garcia's] statements

concerning the intensity, persistence and limiting effects of

[her] symptoms are not entirely credible for the reasons explained

in this decision." (R. 35.) Repeatedly, the Seventh Circuit has

characterized this type of language as "meaningless boilerplate"

because it "yields no clue to what weight the trier of fact gave

the testimony." *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir.

2010); *see also, Martinez v. Astrue,* 630 F.3d 693, 696 (7th Cir.

2011). However, the use of boilerplate language by itself does

not automatically undermine an ALJ's credibility determination if

he or she points to other information that justifies it. *Pepper v. Colvin,* 712 F.3d 351, 368 (7th Cir. 2013). For instance, in *Pepper,* the ALJ followed boilerplate language with a specific discussion of the claimant's testimony in conjunction with the RFC finding. *See, id.* "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002).

Although the ALJ in this case claims that Garcia's testimony is "not entirely credible" for reasons explained in his decision, the Court cannot find any logical bridge between this conclusion and the specific evidence supporting it. At most, the ALJ briefly recounts Garcia's testimony, noting that she could stand for ten to fifteen minutes, sit for thirty minutes, walk up to a half a block without a cane, ride a stationary bike for ten to fifteen minutes, and carry a gallon of milk. (R. 35.) However, the ALJ fails to explain whether any of these activities were "consistent or inconsistent with the pain and limitations [Garcia] claimed." *See, Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). While Garcia's own testimony may have discredited her allegations of pain, "we cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."

*Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). On remand, the Court directs the ALJ to reassess Garcia's credibility, identifying and explaining the "specific reasons" why her testimony is or is not believable.

### D. RFC Determination

The ALJ concluded that Garcia was capable of performing a reduced range of light work, incorporating several limitations into the RFC determination. Specifically, the ALJ noted that Garcia could alternate between sitting and standing during the workday, recognized that she would be unable to "work at heights, climb ladders, or frequently negotiate stairs," and noted that she could only occasionally crouch kneel or crawl. (R. 35–36.) Taking into account her complaints of pain and non-severe mental impairments, Garcia "would be expected to be off task 5% of the time in an 8-hour workday." (*Id.* at 36.) Garcia's main challenge to the ALJ's RFC determination is that the ALJ ignored "her allegations of pain" and her husband's testimony. According to Garcia, "[t]hese considerations should be in her RFC and notably preclude work." (Pl.'s Reply, ECF No. 20, at 5.)

"[A]n ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue,* No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012) (citation omitted). Social Security Regulations require the ALJ's RFC assessment to include "a

narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8P, 1996 WL 374184, at *7 (July 2, 1996). The ALJ must take into account all physical and mental impairments, including those that are not considered "severe." *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(2), (b), (c)). Mental impairments must be considered because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." *Id.* (quoting 20 C.F.R. § 404.1545(c)) (internal quotations omitted).

Here, the ALJ heavily relied on the physical RFC assessment prepared by state agency medical consultant, Dr. Bitzer, (Ex. 10F), who found that Garcia had "no exertional limitations, could occasionally kneel, crouch, and crawl, had no manipulative limitations, no visual limitations, no communicative limitations, and had no environmental limitations." (R. 34.) The ALJ also considered Dr. George Branovacki's June 20, 2011 report concluding that Garcia suffered from "major dysfunction of a weight-bearing joint," (Ex. 2F), but gave this report less weight in light of Dr. Branovacki's subsequent progress notes, which indicated that

Garcia was at times walking without a brace, had full range of motion, and exhibited improving calf strength. (R. 35.) Additionally, the ALJ relied on the VE's testimony that Garcia would be able to perform her past relevant work. (*Id.*)

Garcia's threadbare conclusion that the conditions that she and her husband testified to "notably preclude work" provides no basis to disturb the ALJ's RFC determination. However, remand is nevertheless required for two other reasons. First, the RFC determination makes almost no mention of Garcia's mental impairments. Instead, it contains only the cursory statement Garcia would be expected to be off task 5% of the workday "to take into account her complaints of pain and her non-severe mental impairments." (*Id.* at 36.) Even if the ALJ again determines that Garcia's mental impairments are mild, he must still discuss the impact of these non-severe mental impairments in evaluating her RFC. *See, Denton v. Astrue,* 596 F.3d 419, 423 (7th Cir. 2010). Second, the RFC determination did not discuss Garcia or her husband's testimony "[b]ecause the ALJ found that Garcia was not entirely credible." (Def.'s Mem., ECF No. 19, at 12.) However, the ALJ's determination of Garcia's credibility was inadequate, and the decision makes no mention of her husband's credibility. "RFC determinations are inherently intertwined with matters of credibility." *Outlaw v. Astrue,* 412 F. App'x 894, 897 (7th Cir. 2011). Thus, the RFC may also need to be reassessed if, on

remand, the ALJ finds credible the testimony of Garcia or her husband.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Commissioner's Motion for Summary Judgment [ECF No. 18] is denied, and Garcia's Motion for Summary Judgment [ECF No. 9] is granted. The case is remanded to the SSA for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:8/5/2015